# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER 18-0154** |
| **VERSUS** | * | **JUDGE TERRY A. DOUGHTY** |
| **THOMAS J.M. GOODIN  (01)**<br>**MEKO R. WALKER     (02)**<br>**BRITTANY S. GIX    (03)** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress filed by Defendant Thomas Goodin [doc. # 51]. For reasons explained below, it is recommended that the motion be **DENIED**.

## Background

On November 30, 2017, at approximately 12:30 a.m., Louisiana State Police Trooper Randall Colby Dickerson initiated a traffic stop of a white Ford Fusion after observing the vehicle's tires cross over the solid white fog line that separates the road from the right while traveling eastbound on Interstate 20. (Hearing Transcript ("Tr.") 4–5, [doc. # 104]).

Trooper Dickerson made contact with the driver, later identified as Defendant Goodin, who got out and met Trooper Dickerson at the rear of the vehicle. Trooper Dickerson told Goodin he pulled him over for crossing the fog lines a few times and was checking to see if Goodin was impaired or sleepy. Goodin responded that he was fatigued from driving for a long time. Goodin stated he had left San Bernardino, CA that morning, stopped in Dallas, TX to drop off his girlfriend, and was driving to Monroe, LA to visit family. (Tr. 10–11).

According to Trooper Dickerson, Goodin appeared "very nervous." He would not look Trooper Dickerson in the eyes and exhibited "a lot of nervous behavior." Trooper Dickerson

asked Goodin for identification. Goodin stated he did not have a driver's license but provided Trooper Dickerson with a Louisiana Identification Card issued to Malchia Desha Douzart. The person depicted on the Louisiana ID resembled Goodin, although the height appeared to be off. However, the photograph "looked so much like" Goodin that Trooper Dickerson thought the height could be just a misprint. Trooper Dickerson asked Goodin why he had a Louisiana ID if he lived in California. Goodin responded that he thought it would be good to have Louisiana ID for when he came to Monroe to visit family, which Trooper Dickerson thought was "an odd answer." (Tr. 12–14, 17–18).

Trooper Dickerson patted Goodin down and went back to his vehicle to check the ID and the car and to write Goodin a ticket for having no driver's license. He verified that the license plate was suspended and Douzart had an extensive criminal history. During this time, Trooper Dickerson observed Goodin sit on the ground, then stand up and "sway[] nervously," and exhibit "a lot of nervous movement." (Tr. 14–17, 19).

When he returned with the ticket, Trooper Dickerson asked Goodin—whom he believed to be Douzart—whether he had ever been arrested before. Goodin replied that he had been arrested "for a few bar fights," but Trooper Dickerson already knew from looking up the criminal history that Douzart had been arrested for things more serious than bar fights. Based on Goodin's response, his "nervous behavior," the height on the ID card, the fact that Goodin exited the vehicle "as quickly as he did" when stopped, Trooper Dickerson became "more suspicious that there might something more going on." (Tr. 21–22). Approximately twenty minutes after

2

initiating the stop, Trooper Dickerson issued a citation for driving without a license[1] and then asked for consent to search the vehicle, which Goodin denied. (Tr. 24–25; *see* Gov. Ex. 1[2]).

Trooper Dickerson then called for a K-9. At 1:08 a.m., Deputy Jared Benjamin from the Ouachita Parish Sheriff's Office arrived at the scene with his narcotics certified K-9, Igo. (Tr. 25–26; s*ee* Gov. Exs. 1, 5). At the scene, Deputy Benjamin conducted a safety check of the ground around the vehicle to verify there was nothing that could harm the K-9. He then retrieved Igo and conducted an open air sniff of the vehicle. Igo alerted to the presence of narcotics at the passenger side rear door of the vehicle by swiping his paw across the door. (Tr. 67–71; *see* Gov. Ex. 1).

Deputy Benjamin informed Trooper Dickerson that Igo positively alerted to the presence of narcotics, and troopers[3] began to search the vehicle. When they opened the car they smelled marijuana inside. They then popped the trunk and found two packages wrapped like presents, which they removed and placed on the ground outside the vehicle. (Tr. 30–31). At one of the trooper's request, Deputy Benjamin and Igo conducted a secondary sniff of the interior of the car and Igo alerted to the presence of narcotics in the trunk and in a suitcase on the front passenger floorboard. (Tr. 72–74). The troopers opened the packages. One package contained two Gold Peak Tea bottles, vacuum sealed with a waxy substance, with a yellow tinted liquid inside. The other package contained a handmade candle in a glass jar. (Tr. 31–32).

---

[1] Trooper Dickerson did not write a ticket for the improper lane change or the suspended license plate. (Tr. 26).

[2] Gov. Ex. 1 is Trooper Dickerson's dash camera footage of the stop and search. The footage has no audio. [doc. # 100].

[3] At some point during the stop, Troopers Michael Linton and James Olstead arrived at the scene. (Tr. 26, 49–50).

Trooper Dickerson opened the vacuum sealed bottles and smelled an odor that, based on his experience, he identified as phencyclidine ("PCP"). He then placed Goodin under arrest. The packages later tested positive for PCP and methamphetamine. (Tr. 33, 49). After Goodin was arrested and transported to Troop F, officers located his driver's license inside his wallet and found there was an outstanding warrant for his arrest for the distribution of methamphetamine and conspiracy to distribute methamphetamine. (Tr. 18–19, 34–35; *see* Gov. Ex. 2). In connection with this incident, Goodin was charged with one count of possession with intent to distribute methamphetamine and one count of possession with intent to distribute PCP, both in violation of 21 U.S.C. § 841(a)(1)-(2). [doc. # 1].

On October 19, 2018, Goodin filed a motion to suppress the evidence seized during the traffic stop. He claims (1) the extension of the traffic stop to conduct a dog sniff was unreasonable; and (2) the K-9's signal was unreliable. [doc. # 51-1 at 5].

On March 1, 2019, the Government filed its response claiming (1) the traffic stop was supported by probable cause; (2) there was reasonable suspicion that contraband was in the vehicle in order to extend the stop to wait on the K-9 officers; (3) the certified K-9's positive alert on the vehicle provided probable cause to search the entire vehicle; (4) the contraband would have inevitably been be discovered through an inventory search of the vehicle; and (5) any statements made by Goodin were free and voluntary.[4] [doc. # 83].

Goodin filed a reply on March 5, 2019. [docs. # 84].

---

[4] Goodin does not contest the introduction of any statements he made.

4

A suppression hearing took place on April 1, 2019, with testimony from Trooper Dickerson and Deputy Benjamin. Defendant submitted a post-hearing brief. [docs. # 107]. This matter is ripe.

### Legal Standard

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979).

"A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted).

Generally, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure. This prohibition applies as well to the fruits of the illegally seized evidence." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct: by refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). However, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*

**Discussion**

I. **Traffic Stop**

A traffic stop constitutes a seizure under the Fourth Amendment, and its legality is analyzed under the framework set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, a court determines the reasonableness of a traffic stop by examining "whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. 19–20).

A. Initial Stop

Under the first prong, a traffic stop is justified at its inception when an officer has a reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Id.* Reasonable suspicion exists when officer has "a particularized and objective basis for suspecting legal wrongdoing" based on the totality of the circumstances. *Id.* (internal quotations omitted). An officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.*

Further, the Supreme Court has noted that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of [a stop or] arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." *United States v. Zavala*, 541 F.3d 562, 575 (5th Cir. 2008) (citations omitted). An officer has probable cause to conduct a traffic stop when he personally

observes the defendant commit the traffic violation. *United States v. Rosales-Giron*, 592 F. App'x 246, 251 (5th Cir. 2014).

In this case, the traffic stop was justified at its inception because once Trooper Dickerson observed Goodin's tires cross the fog line, (*see* Tr. 5), he had probable cause to believe a traffic violation, specifically a violation of La. R.S. 32:79, had occurred.

B. Continued Detention

Under the second prong of *Terry*, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). "During a traffic stop, a police officer may examine a driver's license and vehicle registration, [and] run a computer check on the driver and the vehicle." *Zavala*, 541 F.3d at 576. An officer "must ensure that the driver does not have a warrant or a suspended license, and that the vehicle is registered and not reported stolen. These checks are routine and quickly performed." *Id.* at 577. An officer "may also ask about the purpose and itinerary of the occupant['s] trip as part of [his] investigation," because these questions are "reasonably related in scope to his investigation of the circumstances that caused the stop." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). Additionally, an officer may question the driver on matters unrelated to the purpose of a traffic stop, "so long as these unrelated questions do not extend the duration of the stop." *Id.*

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." *Id.* (internal quotations omitted). The

7

authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Thus, although certain unrelated inquiries that do not lengthen a roadside detention are permissible, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002). Reasonable suspicion need not rise to the level of probable cause, but a "mere hunch" will not suffice. *Zavala*, 541 F.3d at 574.

In this case, during the traffic stop, Trooper Dickerson was permitted to question Goodin and run a computer check on the vehicle and identification as these actions are reasonably related to the scope of the stop. At issue is whether Trooper Dickerson impermissibly extended the stop after conducting these checks. Goodin argues that once he was issued a citation and denied consent to search the vehicle, the additional detention while waiting for a K-9 was unreasonable. [doc. # 107 at 8–9]. The Government claims that Trooper Dickerson had reasonable suspicion of criminal activity, which justified extending the stop until the K-9 arrived. [doc. # 83 at 12]. During the suppression hearing, Trooper Dickerson testified that the following caused him to be "suspicious that there might be something more going on," (Tr. 21):

- After being pulled over, Goodin opened the door and exited the vehicle, (Tr. 7–8);

- Goodin would not look Trooper Dickerson in the eyes and exhibited "a lot of nervous movement" such as "sway[ing] nervously" and alternating between standing and sitting when Trooper Dickerson returned to his patrol car to run a check on the vehicle and ID card, (Tr. 12, 16–17);

- Goodin provided a Louisiana ID card even though he said he lived in California for the majority of his life, (Tr. 14);

8

- The height on the Louisiana ID card indicated 5'10", but Trooper Dickerson thought Goodin looked to be at least six feet, (Tr. 17); and

- Goodin failed to reveal his (Douzart's) complete criminal history, (Tr. 21).

The Supreme Court has recognized that, even if the facts articulated by the officer are individually consistent with innocent travel, taken together they can amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Moreover, in considering whether the detaining officer has a "particularized and objective basis for suspecting legal wrongdoing," the court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted).

Here, although the grounds articulated by Trooper Dickerson are individually susceptible to innocent explanation, taken together they support reasonable suspicion of criminal activity. Trooper Dickerson testified that Goodin immediately exited the vehicle after being pulled over, which, from prior stops and training, he knew often indicates "something illegal going on inside the vehicle." (Tr. 12). Further, although Trooper Dickerson initially thought the 5'10" height listed on the Louisiana ID was a misprint, he became suspicious that more was going on in conjunction with Goodin exiting the vehicle quickly and not revealing his complete criminal history. (Tr. 17, 21–22). Finally, the most telling sign of criminal activity is Goodin's unreasonable explanation for having a Louisiana ID card. As Trooper Dickerson testified, Goodin stated that he had lived in California for the majority of his life but "thought it would be good to have" a Louisiana ID when "he came to visit family." (Tr. 14). Trooper Dickerson thought this

9

was "an odd answer" and did not think Goodin "was being completely honest" because nobody has a Louisiana ID "just to have one." (Tr. 14, 52).[5]

Goodin points out that Trooper Dickerson failed to articulate the type of criminal conduct he thought Goodin to be engaged in. [doc. # 107 at 9]. However, the Fifth Circuit has held that police officers do not need "particularized suspicion" of a specific crime. *Pack*, 612 F.3d at 355 (citing *Brigham*, 382 F.3d at 509 & n.8). While officers must be able to articulate a "particularized . . . basis for suspecting wrongdoing," the wrongdoing itself may be stated in general terms. *Id.* at 356. (citations omitted). Here, Trooper Dickerson articulated specific facts that caused him to be suspicious that "something criminal [was] going on inside the vehicle." (Tr. 52–53). Though he did not link those facts to a specific crime, his testimony is enough to support his belief that "criminal activity may be afoot." *See Pack*, 612 F.3d at 356.

Additionally, that Trooper Dickerson may have filled out a portion of the consent to search form before questioning Goodin about his past criminal history, [see doc, # 107 at 10 (citing Tr. 21, 53)], does not negate that reasonable suspicion developed before Trooper Dickerson completed the purpose of the stop.

Although it is admittedly a close question, on consideration of the totality of circumstances, the undersigned finds that the Government has demonstrated a reasonable

---

[5] The undersigned gives little weight to Trooper Dickerson's testimony about Goodin's nervous behavior. The dash camera footage does not depict any excessive nervousness beyond that normally associated with police presence. (*See* Gov. Ex. 1); *United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017) ("Nervousness is an entirely natural reaction to police presence."). That Goodin "swayed nervously" and alternated between standing and sitting, (Tr. 16–17), equally suggest that Goodin was impatient for the traffic stop to be over, as that he was involved in criminal activity. *See United States v. Thibodeaux*, 276 F. App'x 372, 378 (5th Cir. 2008) (no reasonable suspicion where defendant appeared "jittery, emotional, did not want to sit in the police car, moved toward his own car, and left his car door open"). Further, the dash cam footage depicts Goodin responding to Trooper Dickerson and not avoiding eye contact. (*See* Gov. Ex. 1).

suspicion sufficient to prolong Goodin's traffic stop and contact a K-9 unit. The additional fifteen minutes that elapsed before Deputy Benjamin and his K-9 arrived did not unconstitutionally prolong the detention because Trooper Dickerson "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Accordingly, Goodin's continued detention did not violate the Fourth Amendment.

**II.    Vehicle Search**

A. Automobile Exception

"Law enforcement may conduct a warrantless search of an automobile if (1) the officer conducting the search had probable cause to believe that the vehicle in question contained property that the government may properly seize; and (2) exigent circumstances justified the search. In a vehicle stop on a highway, the fact of the automobile's potential mobility supplies the requisite exigency." *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (citations and internal quotation marks omitted). Probable cause to search the vehicle "depends on the totality of the circumstances viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search." *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) (internal quotations omitted).

"[A]n alert by a drug-detecting dog provides probable cause to search" a vehicle. *United States v. Sanchez-Pena*, 336 F.3d 431, 444 (5th Cir. 2003). Further, "a showing of the dog's training and reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle." *Id.* Once probable cause justifies the search of a vehicle, it "justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search." *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999) (citations omitted). This includes containers within the

vehicle as long as officers "have probable cause to believe evidence or contraband is contained" inside. *California v. Acevedo*, 500 U.S. 565, 580 (1991).

Here, Deputy Benjamin testified that Igo gave a positive alert to the presence of drugs inside Goodin's vehicle before any items were removed. (Tr. 70–71; *see* Gov. Ex. 1). Goodin claims the alert is unreliable because Igo continued to signal the trunk even after the items containing narcotics were removed. [doc. # 51-1 at 5]. However, given the positive alert, the Court need not examines the K-9's reliability. *See Sanchez-Pena*, 336 F.3d at 444. Once Igo positively alerted to the presence of narcotics inside the vehicle, the officers had probable cause to search the entire vehicle, including the packages located within the vehicle and those subsequently removed.

Accordingly, the warrantless search of the vehicle did not violate the Fourth Amendment, and the evidence seized as a result of the search should not be suppressed.

B. <u>Inevitable Discovery</u>

Although there was probable cause to search Goodin's vehicle, the undersigned also addresses the Government's argument that the narcotics would have been inevitably discovered because "the car was required to be impounded and would be subject to an inventory search" under La. R.S. 32:863.1(C)(1)(a). [doc. # 83 at 15–16]. La. R.S. 32:863.1(C)(1)(a) requires a vehicle to be impounded if its operator is unable to show proof of insurance.

The Government has not provided sufficient evidence that Goodin had no proof of insurance for his vehicle. Trooper Dickerson testified that he could not remember whether Goodin had a registration or insurance for the vehicle. (Tr. 14). Thus, the undersigned cannot conclude that the vehicle would have been impounded and subject to search under La. R.S. 32:863.1(C)(1)(a).

## Conclusion

For the foregoing reasons,

**IT IS RECOMMENDED** that Defendant's motion to suppress [doc. # 51] be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 20th day of May 2019.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE